Esther WILSON, and Esther Wilson as Personal Representative of the Estate of Thomas G. Wilson, Appellant (Defendant),

v.

Augusta M. McMAHON, Appellee (Plaintiff).

No. 91–168.

Supreme Court of Wyoming.

May 21, 1992.

Mason F. Skiles of Skiles & Hageman, Laramie, for appellant.

Kermit C. Brown and William L. Hiser of Brown, Erickson & Hiser, Rawlins, for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

GOLDEN, Justice.

Appellant Esther Wilson appeals from an order of the district court which granted to appellee Augusta McMahon a judgment notwithstanding the verdict (JNOV) and which conditionally granted a new trial on the issue of damages. The underlying dispute concerned entitlement to $150,000 in life insurance proceeds which were paid to Augusta McMahon following the death of Esther Wilson's husband, Thomas Wilson. Thomas Wilson had assigned the life insurance proceeds to Mrs. McMahon to secure a financial obligation which he allegedly owed to her under a buy-sell agreement. Following presentation of the evidence, the jury returned a general verdict for Esther Wilson. The trial judge granted a JNOV. We will reverse the district court and order that the jury verdict be reinstated.

ISSUES

Esther Wilson frames the issues in this manner:

A. The trial judge erred in granting judgment notwithstanding the verdict.

B. The trial judge erred in ordering a new trial on damages.

Augusta McMahon presents a single issue:

The evidence presented at trial in this case is such that without weighing the credibility of the witnesses, or otherwise considering the weight of the evidence, there can be but one conclusion reasonable persons could have reached: that a good and binding agreement was entered between Thomas G. Wilson and Augusta McMahon and that the same continued in force until his death.

FACTS

Martin McMahon owned and operated McMahon Motors, a Chrysler, Dodge, and Plymouth dealership, in Rawlins, Wyoming, for a number of years prior to 1969. In 1969, Thomas Wilson joined McMahon Motors and became a business partner with Martin McMahon. Mr. McMahon and Mr. Wilson established what was akin to a fa-

ther-son relationship and operated a successful business.

In 1979, Mr. McMahon and Mr. Wilson purchased an ailing corporation known as Fort Steele. Fort Steele consisted of forty acres, a trailer park, and a convenience store. It was indebted to Rawlins National Bank in the amount of $300,000. The corporation's shareholders pledged their stock to the Rawlins National Bank as security for the debt. Fort Steele proved to be an unwise investment. Mr. McMahon and Mr. Wilson were forced to skim profits from the partnership to keep it afloat.

Mr. McMahon died in March of 1983. Mr. Wilson saw to it that Mrs. McMahon was cared for as required by the partnership agreement during the months immediately following her husband's death. The partnership agreement provided that, in the event of death, either partner's surviving widow would receive compensation equal to that of the remaining partner. Accordingly, Mrs. McMahon received from McMahon Motors $1,000 every two weeks, medical insurance, and a car furnished with license, insurance, maintenance, and gas.

Mrs. McMahon, individually and in her capacity as executrix of her husband's estate, Mr. Wilson, and other interested parties entered into a buy-sell agreement on June 22, 1984. The buy-sell agreement purported to set the framework whereby Mr. Wilson would become the sole owner of McMahon Motors and Fort Steele Corporation. The transfer of interests was designed to take place in three essential steps. First, the ownership of Fort Steele was to be consolidated into the hands of Mrs. McMahon and Mr. Wilson. Second, Mrs. McMahon and Mr. Wilson were to transfer the assets of McMahon Motors to Fort Steele in exchange for additional stock. Finally, Mr. Wilson was to purchase all of the McMahons' issued and outstanding stock in Fort Steele. As consideration for the stock, Mr. Wilson and Mrs. McMahon agreed upon a purchase price of $151,227.58, together with twelve percent inter-

est, payable at the rate of $1,000 bi-monthly for a period of ten years. Mr. Wilson also agreed to continue to provide Mrs. McMahon with medical insurance, a car, and related amenities for a ten-year period. The agreement required that Mr. Wilson secure his obligation to Mrs. McMahon with life insurance.[1]

In the years following the execution of the agreement, business was not good. Mr. Wilson was able to honor his obligation to Mrs. McMahon, but was unable to service the other debts that had accumulated. Too proud to file bankruptcy, Mr. Wilson became depressed and ended his life on June 6, 1989.

Following Mr. Wilson's death, Mrs. McMahon received $150,000 from his life insurance company pursuant to an assignment of insurance form which Mr. Wilson had executed on her behalf in August of 1984. Mrs. McMahon then initiated a declaratory judgment action against Mrs. Wilson, the named beneficiary under the policy, to determine their respective rights to the insurance proceeds. The buy-sell agreement provided that the life insurance proceeds were intended to cover the balance of the purchase price remaining due as of the date of Mr. Wilson's death. Mrs. McMahon also filed a claim against the estate of Mr. Wilson to satisfy any obligation that he might owe to her under the buy-sell agreement. The district court consolidated the actions for trial before a jury.

Following presentation of the evidence, Mrs. McMahon moved for a directed verdict. The district court denied the motion and allowed the case to go to the jury. The jury subsequently returned the following verdict, which, although somewhat unusual in form, is general in nature:

1. Do you find that Thomas G. Wilson owed Augusta M. McMahon any money or any other thing of value at the time of his death (June 6, 1989)?

Yes _ No X

(If the answer is "yes," proceed to question 2. If your answer is "no," your

---

1. The agreement contained numerous other provisions relating to the consummation of the sale. Many of the requirements were disregard-ed by the parties and will be addressed as they become relevant in the succeeding discussion.

work is complete, and the effect will result in the $150,000.00 life insurance proceeds together with interest accrued thereon being paid to Esther Wilson from Augusta M. McMahon.)

2. What amount of money is Augusta M. McMahon entitled to?

$ ————

Mrs. McMahon timely filed a motion seeking a JNOV or, in the alternative, a new trial. The district court granted the JNOV and conditionally ordered a new trial on the issue of damages. This appeal followed.

## STANDARD OF REVIEW

This court recently stated the applicable JNOV standard of review:

When this appellate court is faced with a JNOV question, we undertake a full review of the record without deference to the views of the trial court. *Cody v. Atkins*, 658 P.2d 59, 61–62 (Wyo.1983). In determining whether a JNOV motion should be granted, we consider "whether the evidence is such that without weighing the credibility of the witnesses, or otherwise considering the weight of the evidence there can be but one conclusion reasonable persons could have reached * * *." *Erickson v. Magill*, 713 P.2d 1182, 1186 (Wyo.1986). In our review we consider the evidence favorable to the nonmoving party, giving it all reasonable inferences. *Carey v. Jackson*, 603 P.2d 868, 877 (Wyo.1979). A court should cautiously and sparingly grant JNOV motions. *Erickson*, 713 P.2d at 1186.

*Inter–Mountain Threading v. Baker Hughes*, 812 P.2d 555, 558–59 (Wyo.1991).

## DISCUSSION

In his opinion letter, the trial judge stated that the only inference that could be drawn from the jury's verdict was that the jury had found that no buy-sell agreement existed between Mrs. McMahon and Mr. Wilson. The trial judge determined that, even when viewing the evidence in the light most favorable to Mrs. Wilson, there was insufficient evidence to sustain the jury's verdict that an agreement did not exist.

The trial judge accordingly ordered that the judgment entered on the jury verdict be set aside, that judgment be entered for Mrs. McMahon, and that a new trial be conditionally granted on the issue of damages. We disagree with the action undertaken by the trial judge.

The JNOV granted by the district court is founded upon the erroneous premise that the *only* inference that can be drawn from the jury's verdict is that it determined that no agreement existed. Quite to the contrary, our review of the record indicates that numerous inferences might be drawn from the jury's verdict which, if supported by substantial evidence, would sustain the determination reflected thereon. The jury was instructed that Mrs. McMahon bore the burden of proving: (1) that the buy-sell agreement existed; (2) that she had substantially performed her obligations under the agreement; (3) that Mr. Wilson had breached the agreement; and (4) that she had suffered damages in a determinable amount. The jury was further instructed relating to the affirmative defenses raised by Mrs. Wilson. Those defenses included: (1) that, if a contract existed, it was abandoned by the parties; (2) that, if a contract existed, the parties' mutual mistake regarding the terms and conditions of the contract warrants its cancellation; (3) that, if a contract existed, Mr. Wilson's performance was excused because he made the election to declare the contract null and void; and (4) that, if a contract existed, Mrs. McMahon's breach of that contract excused Mr. Wilson's performance.

This court has stated that, when reviewing a general verdict, we will "assume every finding was made which was necessary to sustain the verdict * * * provided only there was substantial evidence which would justify such finding." *Berta v. Ford*, 469 P.2d 12, 15 (Wyo.1970) (quoting *Calwell v. Anderson*, 438 P.2d 448, 452 (Wyo.1968)). In light of the instructions which were given to the jury in this case, its verdict could be sustained upon a finding that Mrs. McMahon failed to carry her burden of proof and/or that one or more of the affirmative defenses applied under the

circumstances of the case. Our task, then, is to review the record and determine whether sufficient evidence exists to support either finding.

Mrs. McMahon was required first to demonstrate that she and Mr. Wilson had at least initially entered into a buy-sell agreement. There can be little argument but that Mrs. McMahon carried her burden of proof in this regard. The actual written agreement, executed by the parties, was introduced at trial. Evidence was also admitted at trial which documented the actions taken in furtherance of the agreement. Moreover, virtually every witness at trial acknowledged an awareness that a buy-sell agreement had at least at one time existed between Mrs. McMahon and Mr. Wilson.

Mrs. McMahon was next required to prove that she had substantially performed her duties under the agreement. Countering Mrs. McMahon's burden of proof in this regard, Mrs. Wilson raised the affirmative defense that Mrs. McMahon had breached the agreement, thereby excusing Mr. Wilson's performance. The trial judge instructed the jury on these matters as follows:

> The plaintiff contends in this case that she has substantially performed the contract. Substantial performance exists where there has been no willful departure from the terms of a contract and no omission in essential points. Substantial performance means that the contract has been honestly and faithfully performed in its material and substantial parts, and the only variance from the strict and literal performance of the contract consists of technical or minor omissions or defect. If you find that the plaintiff has substantially performed all that is required of her, then she did not breach the contract.

The buy-sell agreement contemplated that Mr. Wilson would eventually own 100 percent of Fort Steele Corporation, which would include McMahon Motors. To this end, the agreement required that Mrs. McMahon obtain approval of the sale from the probate court; that she undertake efforts to obtain approval of the sale from Chrysler; that she transfer the McMahon interest in McMahon Motors to Fort Steele; that, after receiving the additional Fort Steele stock, she sign the certificates in blank and escrow them with the Rawlins National bank; that she execute appropriate escrow instructions; that she undertake efforts to place Rawlins National Bank in first secured lender position as to all of Fort Steele's assets; and that she resign as an officer and director of Fort Steele.

The evidence at trial demonstrated that Mrs. McMahon did obtain court approval for the sale; that she did undertake efforts to obtain Chrysler approval; and that she did transfer the McMahon interest in McMahon Motors to Fort Steele. However, the evidence, or lack thereof, also demonstrated that McMahon did not sign the stock certificates in blank and escrow them with the Rawlins National Bank; that she did not execute escrow instructions; that she had failed to take efforts to place Rawlins National Bank in first secured position as to all of Fort Steele's assets; and that she had failed to formally resign as corporate secretary.

As of the date of trial, Fort Steele ownership was represented by stock certificates issued to Martin McMahon (thirty-three shares), Harold Wilson (thirty-three shares), Thomas Wilson (thirty-three shares), Jane Collier (one share), Augusta McMahon (thirty-two shares), and Thomas Wilson (thirty-two shares). The agreement had contemplated the consolidation of Fort Steele ownership into the hands of Mrs. McMahon and Mr. Wilson. They were each to own fifty percent of the corporation, represented by sixty-five shares of stock. Mr. Wilson's agreement was to purchase the McMahons' sixty-five shares. The transaction obviously did not ripen as planned. When asked at trial by her own counsel if she would be willing to execute the documents necessary to complete the transaction, Mrs. McMahon's testimony was equivocal:

Q Do you still think today there's an agreement where you sold the business and Tommy Wilson bought the business?

A Well, yes.

Q And if there were documents that weren't signed at the time that the agreement was closed, would you sign those today, if they were presented to you, to close the deal and to make the agreement as the written agreement says it was to be?

A Well, I don't know if I would now because what I know now. But before I didn't know that they existed. So I don't know what I'd do now.

Q But if there were escrow instructions in the agreement and the agreement said you're supposed to get an escrow, would you do that today?

A I really don't know. I haven't—

Q If the agreement said you're supposed to endorse your stock certificates and you never did that because nobody ever did it, would you do that today?

A I suppose I would. I don't know.

Q Wouldn't you do whatever you had to do that the agreement required?

A Yes.

Applying our oft-cited standard of review for sufficiency of the evidence, we hold that there was substantial evidence presented at trial from which the jury might have concluded, within the bounds of reason, that Mrs. McMahon had failed, or was unwilling, to substantially perform her end of the bargain. *See Medlock v. Merrick*, 786 P.2d 881, 883 (Wyo.1990). Such being the case, the jury verdict for Mrs. Wilson must stand. The district court's order which granted to Mrs. McMahon a JNOV and which conditionally granted a new trial on damages is reversed.

Having disposed of the case as above-stated, we need not consider whether Mrs. McMahon had adequately proved the other elements of her cause of action—breach and damages. Nor is it necessary to review all the evidence as it relates to Mrs. Wilson's affirmative defenses to determine if they too were supported by sufficient evidence. Suffice it to say that a great deal of inconsistent evidence was presented at trial concerning the parties' actions, omissions, intentions, representations, etcetera, as they related to the buy-sell agreement. A significant portion of this evidence was directed at proving Mrs. Wilson's affirmative defenses of abandonment, mutual mistake, and election to cancel. It was that province of the jury to sort and weigh the evidence, to judge the credibility of the witnesses, and to come to a conclusion. *E.g., Medlock*, 786 P.2d at 883–84. That is what the jury did. We find no reason in this case to disturb the jury's work.

## DISPOSITION

The order of the district court granting the JNOV and conditionally granting a new trial is reversed, with directions that the jury verdict be reinstated and that judgment be entered in accordance therewith.

CARDINE, Justice, dissenting, with whom URBIGKIT, C.J., joins.

The question here presented is which of two widows should suffer the detriment of a depressed economy causing loss of business, loss of value of assets, and eventual bankruptcy. Resolution of the question should not involve the natural sympathy a jury might have for one who most recently and tragically lost her husband or who might be in the greatest financial need. Rather, the question should be resolved by application of law, giving effect to and enforcing the solemn written agreements of the parties as the parties themselves recognized and acted in accordance with their provisions during their lifetime. I would hold that neither widow gets all.

The husbands of appellant Wilson and appellee McMahon entered into a business partnership for the operation of a car dealership in 1969. Mr. McMahon died during March 1983. The partnership agreement required Wilson to pay appellee, Mrs. McMahon, $1,000 every two weeks plus furnish medical insurance, a car, license, auto insurance, maintenance, and gas. On June 22, 1984, the parties made a written agreement by which Wilson purchased ap-

pellee's entire interest in the business for $151,227.58, to be paid $1,000 twice monthly plus medical insurance, a car, license, auto insurance, maintenance, and fuel. This was essentially what Mr. Wilson was required to pay under the partnership agreement. The net effect was that he was purchasing the business without incurring an additional obligation. During the ensuing five years, the parties treated the agreement as in force and effect. Mr. Wilson paid appellee according to the terms of the agreement. He made no objections or demands of any kind.

The debt to appellee for the sale of her partnership interest was secured by purchase of a $150,000 insurance policy which is the subject of this litigation. The trial to determine who should receive what from the $150,000 insurance payment following Mr. Wilson's death was to a jury. The jury returned a verdict in favor of appellant Mrs. Wilson, finding that nothing was owed Mrs. McMahon and effectively awarding the entire $150,000 proceeds from insurance to Mrs. Wilson. The trial court granted a judgment notwithstanding the verdict and ordered a new trial on the question of damages. Were we to affirm, the effect of that trial court's decision would be to award to Mrs. McMahon the amount still owed to her and award the balance to Mrs. Wilson.

Judgment notwithstanding the verdict was entered pursuant to W.R.C.P. 50(b) which provides in pertinent part:

> If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed.

When the evidence is wholly insufficient to support a verdict, it is the duty of the trial court to direct a verdict or enter a JNOV, thus promoting judicial economy. *Erickson v. Magill*, 713 P.2d 1182, 1186 (Wyo. 1986); *Cody v. Atkins*, 658 P.2d 59, 63–64 (1983). In determining whether a JNOV is proper, we apply the same test on appeal as does the trial judge in considering the motions originally, *i.e.*, whether the evidence is such that without weighing the credibility of the witnesses, or otherwise considering the weight of the evidence, there can be but one conclusion reasonable persons could have reached. *Carey v. Jackson*, 603 P.2d 868, 877 (Wyo.1979).

In this case, the undisputed evidence establishes the parties made an agreement to sell and to buy Mrs. McMahon's interest in the automobile and business partnership. They treated the agreement as a complete, enforceable obligation and performed under the agreement for five years. That some minor details were left to be completed did not concern the parties—probably for two reasons: First, there was no question that the minor details left would be performed upon simple request. However no such request or demand was ever made. Second, when the economy turned sour, business and profits were down, the business was unable to meet its obligations, and performance of housekeeping details was not a very significant or necessary concern.

The majority opinion cites question-and-answer testimony of appellee McMahon as evidence of an unwillingness to perform her obligations under the agreement. At best, the testimony is equivocal. In truth, it demonstrates lack of understanding of its legal ramifications by a lay person. In fact we know that had there been a demand for performance, Mrs. McMahon would have complied: First, because it was in her best interest to do so, and second, because, being required to perform as a matter of law, she would have had no other choice. The effect of the majority decision here is an all-or-nothing result, *i.e.*, one party gets all, the other party gets nothing. That is unfair, is not justice, and thus the reason for my dissent.

The trial judge here had the benefit of sitting through several days of trial, watching live witnesses testify, observing their demeanor on the witness stand, and being involved in the dynamics of the trial. The trial court can better assess whether a verdict is the result of emotion, sorrow, and sympathy for a widow who, with her

husband, suffered through the depression of a failing business and ultimate suicide. The trial court concluded that neither appellant nor appellee should receive the entire $150,000 insurance policy but that appellee should receive what was due and unpaid, appellant should receive the balance left after payment. Thus the order for new trial on damages. I agree with the trial court's disposition and would affirm.